# In the United States District Court
## for the Southern District of Georgia
### Brunswick Division

| | | |
|---|---|---|
| QUORUM HEALTH RESOURCES, LLC, | * | |
| | * | |
| Plaintiff/Counter-Defendant | * | |
| | * | |
| vs. | * | CV 208-042 |
| | * | |
| THE HOSPITAL AUTHORITY OF | * | |
| WAYNE COUNTY, GEORGIA, d/b/a | * | |
| WAYNE MEMORIAL HOSPITAL, | * | |
| | * | |
| Defendant/Counter-Plaintiff | * | |
| | * | |
| CHARLES R. MORGAN and | * | |
| GEORGE KING | * | |
| | * | |
| Third Party Defendants | * | |

## ORDER

Presently before the Court are Quorum Health Resources, LLC's ("QHR") Motion for Partial Summary Judgment (Dkt. No. 120), The Hospital Authority of Wayne County, Georgia, d/b/a Wayne Memorial Hospital's ("WCHA") First Motion for Summary Judgment (Dkt. No. 148), WCHA's Second Motion for Summary Judgment (Dkt. No. 169), QHR's Motion for Summary Judgment (Dkt. No. 180), George King's Motion for Summary Judgment (Dkt. No. 172), and Charles Morgan's Motion for Summary Judgment (Dkt. No. 177). QHR's Motion for Partial Summary Judgment is **DENIED**.

AO 72A
(Rev. 8/82)

WCHA's First Motion for Summary Judgment is **DENIED**. WCHA's Second Motion for Summary Judgment is **DENIED AS MOOT**. QHR's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**. King's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**. Morgan's Motion for Summary Judgment is **GRANTED**.

## I.   BACKGROUND

This case arises out of a once amicable business relationship turned sour. For over twenty-five years, QHR provided administrative services to WCHA, and was largely responsible for running the day-to-day operations of the hospital. That relationship came to an abrupt end in 2007, after WCHA had to restate its profitability for the years 2002-2006, transforming an $8.3 million gain into an $1.2 million loss. WCHA's profitability had to be restated because George King, a QHR employee who served as WCHA's Chief Financial Officer, systematically underestimated bad debt expenses. WCHA claims that King fraudulently underestimated bad debt expense to inflate artificially WCHA's profitability, resulting in financial gain to himself and QHR. QHR responds that King made an innocent mistake while he was attempting to correct an error

caused by the computer program used at WCHA for accounting and record keeping. That is the essence of the dispute.

## A. The Contracts

WCHA is responsible for managing Wayne Memorial Hospital (sometimes referred to as "Wayne Memorial" or "the hospital" throughout this Order). Wayne Memorial is a small, rural hospital located in Jesup, Georgia. The members of the WCHA Board of Directors all have other jobs, and none is an expert in hospital management or finance. QHR is a hospital management and consulting firm headquartered in Brentwood, Tennessee. QHR provides myriad services to many hospitals.

The relationship between QHR and WCHA began over thirty years ago, in 1978. The contracts relevant to this dispute went into effect in 1991 and 2006 (the "1991 contract" and "2006 contract").[1] Under both contracts, QHR agreed to provide to WCHA administrative services, access to consulting and educational services, access to group purchasing organizations, and a CEO and CFO. At times relevant to the instant motions, the position of CEO was filled by Third-Party Defendant Charles Morgan, and the position of CFO was filled by Third-Party Defendant George King.

---

[1] The 1991 contract was amended slightly in 1996 and 2000. Neither amendment is relevant to this suit. The amendments are arguably relevant to one of WCHA's breach of contract Counterclaims, but for reasons discussed below, WCHA has elected to proceed solely on its fraud claims.

Charles Morgan began his duties as CEO in 1983, and served in that position until his retirement in April of 2007. King began his tenure as CFO in 2000, and served in that capacity until QHR suspended him in October 2006. By most accounts, WCHA improved substantially during Morgan's tenure. King was responsible for the underestimation of bad debt expenses that led to this lawsuit.

The 1991 contract was set to expire on December 31, 2005. Desiring to continue the business relationship, QHR and WCHA spent substantial time in 2005 negotiating a new contract. QHR desired a more modern contract. As part of the negotiations, QHR Regional Vice President Michael Kozar gave a presentation to the WCHA Board of Directors on August 10, 2005. In that presentation, Kozar claimed that, during QHR's tenure, WCHA only lost money in 1986, 1998, and 2001. Kozar also claimed that WCHA made $8.3 million between 2002 and 2006.

The negotiations culminated in the signing of the 2006 contract in December of 2005. The 2006 contract contains terms substantially more favorable to QHR, though counsel for WCHA was heavily involved in the negotiation process. It was not long after the 2006 contract was signed, however, that the relationship between QHR and WCHA deteriorated.

AO 72A
(Rev. 8/82)

## B. The Accounting Irregularities

Sandra Albrecht, QHR Regional Assistant Vice President, first became concerned with King's accounting practices at WCHA in May 2005, and began inquiring into the accounting and billing practices at WCHA well before Kozar's presentation to the WCHA Board. Albrecht was principally concerned with a financial metric known as "net account receivable days."[2] Albrecht was concerned that net accounts receivable days were too high, so she called in QHR Patient Financial Services consultant Dan Hobbs to investigate. Hobbs finished his investigation in July 2005, and found that net accounts receivable days were very high (ranging from 78-97 for the past year, when ideally they should be around 45), and that gross accounts receivable days were significantly lower. Albrecht, however, concluded that the problem was one of methodology.

Albrecht apparently became concerned again about King's accounting procedures in March of 2006. She decided to conduct a financial operations review at WCHA for the first time since 1999. QHR reported the preliminary results of the review to the WCHA Board on August 17, 2006. QHR informed WCHA that net accounts receivable had been overstated. QHR suspended King

---

[2] The precise definitions of net accounts receivable days and gross accounts receivable days are not material to this Order, except that a disparity between net accounts receivable days and gross accounts receivable days can be caused by overstating or understating net accounts receivables.

AO 72A
(Rev. 8/82)

with pay on October 26, 2006, and without pay on November 9, 2006. He later resigned.

QHR presented the full results of the financial operations review to the QHR Board on December 8, 2006. QHR informed WCHA that net accounts receivables were overstated because King erroneously adjusted accounts receivable and bad debt expenses beginning in fiscal year 2002. (Dkt. No. 169-7.) These errors required a reduction in WCHA's earnings by over $9 million for the period between 2002 and 2006. Thus, the $8.3 million profit Kozar presented to WCHA in August of 2005 turned out to be a loss of over $1 million.

### C.   The Bonds

Against the backdrop of these accounting irregularities is the construction of the new Wayne Memorial Hospital and the bond financing thereof. WCHA began contemplating building a new hospital by at least 2003. Serious planning for the new hospital began in 2005, including plans to finance the hospital. WCHA and Wayne County ended up financing the hospital through three bond issues: Revenue Anticipation Bonds ($27,135,000); General Obligation Sales Tax Bonds ($9,285,000); and General Obligation Bonds ($15,150,000). At issue in this case are the Revenue Anticipation Bonds, particularly $5 million of the $27,135,000 total.

The Revenue Anticipation Bonds issued by WCHA offer two layers of protection for bondholders. The first layer of protection is WCHA's income stream. The second layer is the Wayne County tax revenue. The bonds are first paid from WCHA's income. In the event WCHA is unable to meet its obligations, the bonds are paid by Wayne County's tax revenue. When deciding how much bond debt WCHA could safely incur, however, Bryce Holcomb, the Citigroup Bond Broker who handled the bond financing for WCHA, only looked to WCHA's ability to pay. Thus, when WCHA and QHR inquired into the feasibility of an additional $5 million in revenue anticipation bonds (which brought the total issue to over $27 million - the number referenced above), Holcomb looked solely to WCHA's earnings history. These numbers were supplied to him by King on July 19, 2005, and were based on the inaccurate numbers King was calculating at that time. Holcomb approved the additional $5 million based on the inaccurate numbers, and testified in his deposition that he would not have approved the additional $5 million had he known the true numbers.

The Revenue Anticipation Bond issue became final on May 2, 2006. With financing in place, ground breaking was held on June 2, 2006. The topping out ceremony was held on December 6, 2006 - two days before QHR presented to WCHA the full results of the financial operations review. Thus, by the time WCHA learned

that it had really lost money over the past five years, the new hospital was already built.

### D.  Contract Termination

After WCHA's earnings had to be restated by over $9 million, the relationship between QHR and WCHA began to sour. WCHA finally decided to terminate the 2006 contract, and its relationship with QHR, in late March of 2007.  Noting that it had lost all confidence in QHR, and claiming that QHR fraudulently induced it to enter into the 2006 contract,  WCHA sent QHR a letter in March stating that WCHA was terminating the contract, effective May 31, 2007.  WCHA again wrote to QHR on May 23, 2007, to notify QHR that the cure period had ended, but asked QHR to continue cooperating with it until June 24, 2007. WCHA eventually replaced all of the QHR personnel working at WCHA, and began using a different purchasing agent.

The financial position of WCHA after the new hospital was constructed is very much in dispute.  QHR asserts, with some factual underpinnings, that WCHA is doing well after the construction of the new, eighty-four-bed hospital.  WCHA responds, also with some factual basis, that it is having cash flow problems and difficulty paying its bills.

WCHA first filed suit against QHR, King, and Morgan for fraud and breach of contract claims in the Superior Court of

Wayne County, Georgia on February 29, 2008. QHR filed this action on April 11, 2008. After this Court denied WCHA's Motion to Dismiss (*See* Dkt. No. 18), WCHA filed a Third-Party Complaint against King and Morgan, and dropped its state court lawsuit.

## II. Discussion

This case involves numerous claims, counterclaims, and motions. QHR filed a Complaint against WCHA for breach of contract. WCHA filed a Counterclaim against QHR and a Third-Party Complaint against King and Morgan for two counts of breach of contract, two counts of fraud, and one count of Georgia RICO. QHR, King, and Morgan move for summary judgment on all of WCHA's claims, and WCHA moves for summary judgment on QHR's claim against it. WCHA has elected to proceed solely on its fraud and RICO claims. Accordingly, WCHA's breach of contract claims are hereby DISMISSED.

Summary judgment is appropriate when there are no disputed issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The party seeking summary judgment can discharge its initial burden by demonstrating the absence of a material issue of fact for an essential element of which the opposing party bears the burden of proof. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587& n.10, 106 S. Ct. 1348 (1986). The

AO 72A
(Rev. 8/82)

opposing party must then put forth evidence sufficient to enable a "rational trier of fact" to find in its favor. *Id.* at 587. The Court must then determine whether the trier of fact could reasonably find in the nonmovant's favor. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097 (2000). In so determining, the Court "may not make credibility determinations or weigh the evidence." *Id.* Before turning to the substance of the various Motions, the Court examines two issues that relate to multiple claims and defenses – the borrowed servant doctrine and election of remedies. The Court then examines the substance of the Parties' Motions.

## A.    The Borrowed Servant Doctrine

QHR argues that King and Morgan were borrowed employees of WCHA under both the 1991 and 2006 contracts. If the borrowed servant doctrine applies, King's actions and knowledge would not be imputed to QHR, and WCHA would thus be unlikely to recover on any of its claims. Under Georgia law, the borrowed servant doctrine applies if "(1) the special master had complete control and direction of the servant for the occasion[,] (2) the general master had no such control, and (3) the special master had the *exclusive right* to discharge the servant." *Tim's Crane & Rigging, Inc., v. Gibson*, 278 Ga. 796, 797, 604 S.E.2d 763 (2004) (emphasis added, internal quotation marks omitted). The

AO 72A
(Rev. 8/82)

special master has the "exclusive right to discharge the servant," *Id.*, if the special master can "unilaterally discharge" the servant. *See Six Flags Over Ga., Inc. v. Hill*, 247 Ga. 375, 377, 276 S.E.2d 572 (1981). And, where a contract governs the employment relationship, the terms of the contract control the inquiry. *See Tim's Crane*, 278 Ga. at 797.

King and Morgan were not borrowed servants of WCHA under the 2006 contract. Although that contract uses the phrase "borrowed employees," it merely gives WCHA "the right to request that Quorum remove or replace any Special Employee at any time during the term." (Dkt. No. 180-8 § 2.1.1.) The right to request the general master to remove a servant is not the same as the right to discharge the servant unilaterally. Nor is the right to request the same as the right to require or to demand.

Contrast the 2006 contract between QHR and WCHA with the contract at issue in *Southway Industrial Services, Inc. v. Boyd*, 283 Ga. App. 850, 642 S.E.2d 889 (2007). That contract provided that the special master "has the exclusive right to discharge the Operator from the work he is doing, that [the special master] may require [the general master] to replace the operator with another of [the special master's] employees and that [the special master] may put the crane operator to other work." *Id.* at 853. That contract plainly gives the special master the right to discharge the special employee or *require* the general

AO 72A
(Rev. 8/82)

master to replace the special employee.  The 2006 contract at issue here, by contrast, merely gives WCHA the right to *request* QHR to fire or replace the employees, and puts no affirmative duty on QHR to honor that request.  King and Morgan, therefore, are not borrowed servants of WCHA under the 2006 contract.

Nor are King and Morgan borrowed servants of WCHA under the 1991 contract.  The 1991 contract states that the positions of CFO and CEO – occupied by King and Morgan at the relevant time – are "key personnel," and "shall be employees of Quorum."  (Dkt. No. 180-5, § 3(a).)  The next sentence states, "All other hospital personnel shall be employees or independent contractors of the Hospital and shall be subject to the Hospital's personnel policies."  (*Id.*)  Read together, those sentences establish that King and Morgan – the "key personnel" – are employees of QHR, not WCHA, and are not subject to WCHA's personnel policies.  The first two requirements for the borrowed servant doctrine to apply thus are not met: the contract does not give WCHA total control over King and Morgan or divest QHR of such control.

Additionally, the 1991 contract does not grant WCHA exclusive authority to terminate King and Morgan.  The contract does provide that "the selection of Key Personnel and their replacements shall be subject to the Authority's approval, which shall not be unreasonably withheld."  (*Id.* at § 4(a).)  That language, however, merely gives WCHA authority to approve or

AO 72A
(Rev. 8/82)

(reasonably) disapprove of personnel selected by QHR *at the time of selection*. It does not provide that the Key Personnel will serve subject to WCHA's *continuous* approval; much less that WCHA can discharge them unilaterally.[3]

## B. Election of Remedies

The second argument that touches on multiple claims is QHR's election of remedies argument. QHR argues that by affirming the 2006 contract and suing for breach, WCHA is precluded from asserting fraud in the inducement as a defense to QHR's breach of contract claim and from pursuing WCHA's fraud claims. WCHA counters that it has not affirmed the 2006 contract and is entitled to pursue its fraud claims. WCHA has also elected to proceed solely on its fraud claims, not its breach of contract claims:

> WCHA has certainly made its "election." As has been obvious for some long time, WCHA is comfortable indeed to proceed to trial based on its theory of fraudulent violation of fiduciary duty, and other claims also

---

[3] QHR asserts that "[s]ection 3(a) [of the 1991 contract] further provided that King and Morgan would perform their administrative duties '[s]ubject to . . . the Authority's continuing control and direction.' (*Id.* at 6)." (Dkt. No. 200, 8) (quoting the 1991 contract, ellipses and citation as in original). The quoted language appears under the heading "3. **DUTIES OF QUORUM.**" The full sentence is "Subject to the limitations set forth in Section 3(k) hereof and the Authority's continuing control and direction, Quorum agrees to perform the administrative services described herein including responsibility for the day-to-day business affairs of the Hospital." The "subject to" language thus relates to QHR's general duty to provide administrative services, not the specific degree of control WCHA possesses over King and Morgan, as QHR's selective quotation indicates. In fact, neither subsection concerning the Key Personnel contains such a restriction. (*See* Dkt. No. 180-5 § 3(a) & 4(a).)

AO 72A
(Rev. 8/82)

> sounding in fraud. Thus, there will be no
> question at all as to inconsistent verdicts
> here.

(WCHA's Br. in Opp., Dkt. No. 206, 7.) The Court accepts WCHA's unequivocal election. WCHA's breach of contract claims are thus abandoned, and the only election of remedies issue is whether WCHA is precluded from asserting a fraud in the inducement claim based on its alleged failure to rescind the 2006 contract.[4]

"In general, a party alleging fraudulent inducement to enter a contract has two options: (1) affirm the contract and sue for damages from the fraud or breach; or (2) promptly rescind the contract and sue in tort for fraud." *Ekeledo v. Amporful*, 281 Ga. 817, 819, 642 S.E.2d 20 (2007). Contrary to QHR's argument, WCHA would not be precluded from pursuing its fraud claims related to the 2006 contract if WCHA affirmed that contract. A party who affirms a contract containing an entireties clause, however, is bound by the terms of the clause. *See id.* The party is thus estopped from claiming to have relied on the other party's misrepresentations because it disclaimed reliance on representations in the entireties clause. *Id.* The

---

[4] QHR does mention the 1991 contract in the sections of its briefs dealing with election of remedies, but does not state why the presence of an entireties clause in the 1991 agreement would preclude any of WCHA's fraud claims related to that agreement. Moreover, the entireties clause in the 2006 contract only disclaims reliance on representations "relating to the subject matter of this Agreement." As QHR notes in its brief, the subject matter of the 2006 contract is the relationship between WCHA and QHR going forward, and includes representations made in furtherance of the contract negotiations. The clause does not apply to representations, unrelated to the negotiations and presentations regarding the 2006 contract renewal, made while the 1991 contract was in effect.

AO 72A
(Rev. 8/82)

entireties clause at issue in *Ekeledo* did not expressly disclaim reliance on representations, *Id.* at 818, so this result holds even if the entireties clause does not expressly disclaim reliance on representations.

The 2006 contract between QHR and WCHA contains an entireties clause:

> This agreement contains the entire agreement among the parties relating to the subject matter of this Agreement. Except as otherwise provided herein, the terms of this Agreement may be modified or amended only by written agreement of the parties. Without limiting the foregoing, no contract, agreement, job description or other instrument entered into between the Hospital and any Special Employee shall in any way expand or modify the duties, obligations or liabilities of Quorum.

(Dkt. No. 180-8 § 10.5.) WCHA would therefore be estopped from asserting its fraud in the inducement claims and defenses unless it rescinded the 2006 contract. QHR argues that WCHA has affirmed the contract by retaining the benefits QHR provided to it, filing suit for breach of contract and not seeking rescission, and cancelling the contract in accordance with the contract's termination provisions.

The general law governing rescission of contracts in Georgia has been settled for over 100 years:

> "It is a well-settled rule that a party who is entitled to rescind a contract on account of fraud or false representation, when he has full knowledge of all the material

> circumstances of the case, if he freely and
> advisedly does anything which amounts to the
> recognition of the transaction or acts in a
> manner inconsistent with its repudiation it
> amounts to acquiescence, and though
> originally impeachable, the contract becomes
> unimpeachable even in equity."

*Gibson v. Alford*, 161 Ga. 672, 685, 132 S.E. 442 (1926) (quoting

*Hunt v. Hardwick & Co.*, 68 Ga. 100 (1881)). Importantly,

terminating a contract is not the equivalent of rescinding a

contract. *See Loeb v. Nationwide Mut. Fire Ins. Co.*, 162 Ga.

App. 561, 562, 292 S.E.2d 409 (1982).

In *Loeb*, the defendant-insurance company cancelled the

plaintiff's insurance policy when it learned that the plaintiff

made a material misrepresentation on his insurance application.

*Id.* at 561-62. Rather than returning the premium and rescinding

the policy, however, the insurer cancelled the policy, effective

one month from the notice of cancellation, and retained the

portion of the premium covering the period from the policy's

effective date until the date cancellation became final. *Id.* at

562. The plaintiff suffered a loss after the insurer sent the

notice of cancellation, but before the cancellation became

effective. *Id.* The defendant denied the claim based on the

insured's misrepresentation. *Id.* The court, however, held that

because the insurer terminated rather than rescinded the policy

and retained the premium, the policy was not void from its

inception, and the insurer could not rely on the insured's

AO 72A
(Rev. 8/82)

misrepresentation to deny the claim.  *Id.*  In so holding, the

Court stated:

> In its letter of notice of termination,
> [defendant] advised [plaintiff] that notice
> was necessary not only to cancel the
> coverage but to advise [plaintiff] to obtain
> other protection because *continuous*
> protection was important.  It is clear
> therefore that Nationwide did not consider
> the policy void from December 1 [the
> effective date] but considered it in effect
> until June 9, 1979 [the cancellation date].

*Id.* (emphasis in original).

Like the defendant in *Loeb*, WCHA terminated rather than

rescinded the 2006 contract.  QHR first informed WCHA of the

accounting issues in December 2006.  In late March of 2007, WCHA

notified QHR that it was terminating the 2006 contract,

effective May 31, 2007.  (Dkt. No. 180-58.)  WCHA wrote to QHR

again on May 23, 2007, to notify QHR that the cure period had

expired, but asked QHR to cooperate with it until June 24, 2007,

"to prevent further losses and damage to the hospital."  (Dkt.

No. 180-59.)  WCHA wrote to QHR on June 22, 2007, reminding QHR

that the contract would terminate on June 24.  (Dkt. No. 180-

60.)  WCHA also notified QHR that WCHA would remove QHR as an

additional insured on various insurance policies, effective

August 1, 2007.  (*Id.*)  QHR responded that the 2006 contract

prevented WCHA from removing QHR as an additional insured, and

stated that it would not be in WCHA's interest to do so since

17

WCHA would still be required to indemnify QHR. (Dkt. No. 180-61.) WCHA reluctantly agreed to extend tail coverage to QHR. (Dkt. No. 180-62.) It is thus clear that WCHA considered the 2006 contract terminated as of June 24, 2007, not void from January 1, 2006. WCHA provided a set date on which the contract would terminate, and treated it as in effect prior to that date. Moreover, WCHA's duty to provide tail coverage to QHR arose under the 2006 contract.[5] By complying with that provision, WCHA acknowledged that it was bound by the 2006 contract.

There are distinctions between this case and *Loeb*. None of the Parties have identified a benefit that WCHA could possibly return. The 2006 contract is a service contract, and WCHA cannot reverse time's arrow to return the services QHR provided. Most importantly, the insurer in *Loeb* retained the benefits of the contract (the premium) and sought to avoid the costs (covering claims). WCHA did the opposite. It agreed to extend tail coverage to QHR – a cost – but ended QHR's management duties – a potential benefit. The Court has not found a Georgia case holding that a party affirmed a contract by extending a benefit to the other party upon termination. Nevertheless, the rule in *Loeb* is clear, and applies in this case.

---

[5] Section 7.6 of the 2006 contract provides that if WCHA purchases liability insurance on a claims-made form and the 2006 contract is terminated, WCHA must continue to provide QHR with tail coverage for claims arising before the termination or expiration but reported thereafter.

AO 72A
(Rev. 8/82)

The Court therefore holds that WCHA affirmed the 2006 contract. Accordingly, WCHA is bound by the entireties clause and is estopped from claiming reliance on representations made outside of the 2006 contract. *See Ekeledo*, 281 Ga. at 819.

### C. **WCHA's Fraud Claims and Defenses Against QHR**

The heart of the controversy between WCHA and QHR lies in WCHA's fraud claims and defenses, especially now that WCHA has elected to proceed solely on its fraud and RICO claims. Additionally, QHR's breach of contract claim turns primarily on whether QHR fraudulently induced WCHA to enter into it. A fraud claim in Georgia consists of five elements: "(1) a false representation or concealment of a material fact; (2) scienter; (3) intent to induce the allegedly defrauded party to act or refrain from acting; (4) justifiable reliance; and (5) damages." *Merritt v. Marlin Outdoor Adver., Ltd.*, 298 Ga. App. 87, 92, 679 S.E.2d 97 (2009). Fraud is often subtle, and resort to circumstantial evidence is often required. *See GIW Indus., Inc. v. JerPeg Contracting, Inc.*, 530 F. Supp.2d 1323, 1335 (S.D. Ga. 2008) (collecting Georgia cases). As a result, "it is peculiarly the province of the jury to pass on the circumstances showing fraud." *Id.*

AO 72A
(Rev. 8/82)

### i.   **Fraud in the Inducement Defense**

QHR claims that WCHA breached the 2006 contract by terminating it before its expiration date.  WCHA responds that it was entitled to terminate the agreement because QHR fraudulently induced WCHA to enter into it by misrepresenting WCHA's profitability during QHR's tenure.

On August 10, 2005, QHR Regional Vice President Michael Kozar presented a "Management Contract Renewal Proposal" to the WCHA Board of Directors.  (Dkt. No. 206-16.)  In that proposal, Kozar represented to WCHA that it only lost money in 1986, 1998, and 2001.  Those figures, however, were based on flawed data. It is undisputed that King underestimated bad debt expenses to the tune of over $9 million during his tenure at Wayne Memorial Hospital.  Once discovered, this discrepancy resulted in a restatement of WCHA's 2002-2006 earnings from an $8.3 million profit to a $1.2 million loss.  WCHA lost over $1  million from 2002-2004, despite Kozar's representation that it made money in each of those years.  WCHA contends that King and QHR knew the numbers were incorrect but presented them over the course of five years to obtain higher bonuses, complete the financing and construction of the new hospital, and obtain the 2006 contract renewal.

Even if WCHA is correct about King and QHR's motives, it still cannot succeed on a fraud in the inducement defense

AO 72A
(Rev. 8/82)

because it is estopped from claiming reliance on misrepresentations. WCHA's First Motion for Summary Judgment (Dkt. No. 148.) is therefore **DENIED**. Material issues of fact remain on QHR's breach of contract claim.

### ii. Counterclaim Count III

WCHA asserts two distinct fraud claims in Count III of its Counterclaim against QHR. First, WCHA alleges that QHR made willful misrepresentations in connection with WCHA's bond financing of the new hospital. (Dkt. No. 12 ¶ 63.) Second, WCHA alleges that QHR sold WCHA "goods and supplies . . . at cost[s] in excess of fair value . . . under [QHR's] contract with WCHA." (*Id.* at ¶ 64.) QHR moves for summary judgment on both.

WCHA argues that QHR committed fraud "when it represented to Mr. Holcomb, through its employees King and Morgan, that WCHA had made profits that it . . . knew had not been made." (Dkt. No. 144, 50.) Mr. Holcomb is the bond underwriter at Citigroup who handled the bond financing for the new hospital. WCHA argues that these representations convinced Mr. Holcomb to approve, and WCHA to incur, an additional $5 million in debt. Holcomb stated in his deposition that he would not have agreed to the additional $5 million in debt capacity had he known WCHA's true financial history before the issue became final.

AO 72A
(Rev. 8/82)

QHR attacks this claim on two grounds.  First, QHR argues that the financial statements King supplied to Holcomb were not fraudulent, but simply innocent mistakes.  Second, QHR argues that WCHA has not suffered any bond-related damages.

As an initial matter, the entireties clause does not foreclose this claim.  That clause disclaims reliance on representations made in connection with the Parties' decision to sign the 2006 contract.  The alleged misrepresentations regarding WCHA's ability to incur an additional $5 million bond debt are independent of representations made in connection with the 2006 contract negotiations or the contract's meaning, and in no way alter any of the contract's terms.   The Supreme Court of Georgia has said of merger clauses: "prior or contemporaneous representations that contradict the written contract cannot be used to vary the terms of a valid written agreement purporting to contain the entire agreement of the parties . . . ."  *First Data POS, Inc. v. Willis*, 273 Ga. 792, 795, 546 S.E.2d 781 (2001).  Because WCHA is not attempting to contradict the terms of the contracts or deny their validity in *this* claim, the entireties clause does not bar it.

Whether King and QHR committed fraud or made an innocent mistake when they reported incorrect numbers is a question of fact. To resolve this disagreement, a brief foray into hospital accounting is required.  No hospital collects 100% of what it

bills.  In fact, hospitals rarely collect more than 50% of what they bill.  In other words, the ratio between gross accounts receivable and net accounts receivable is rarely over 50%. Every hospital inevitably makes two write-offs from its gross accounts receivable - contractual reserves and bad debt expenses.  Insurance companies and governments have agreed-upon rates with medical providers that are often substantially less than the provider otherwise charges.  The difference between the agreed-upon rate and the original rate is the contractual reserve.  Additionally, not everyone who visits the hospital pays their bill in full, or at all.  Uncollected bills are the bad debt expense.  Because the hospital cannot be sure who will pay their bill in full and who won't, bad debt expense must be estimated.  Contractual reserves and estimated bad debt expenses are subtracted from gross accounts receivable to determine net accounts receivable.

Though the parties disagree on the exact calculation, the numbers in the record do indicate that the ratios between gross accounts receivable and net accounts receivable King was calculating were substantially higher than one would expect for a small, rural hospital.  Other metrics appear to have been out of line as well, such as net patient account receivable days. These metrics were out of line because King was underestimating bad debt expense, and, therefore, overstating net accounts

23

receivable. WCHA contends that the discrepancy arose because King was intentionally and fraudulently underestimating bad debt expense. WCHA's current auditor, who has extensive experience in hospital accounting, agrees that King had to have known that his numbers were wrong. Knowingly presenting false numbers satisfies the first two elements of fraud.[6]

Additionally, King and QHR had a financial incentive to overstate Wayne Memorial's profitability. King was awarded performance-based bonuses during his tenure at Wayne Memorial: the higher Wayne Memorial's profits, the higher King's bonus. QHR was in the process of negotiating a new contract with WCHA during much of the relevant time (2002-2006). QHR would obviously be in a much stronger negotiating position if WCHA was profitable than if it was losing money. QHR also stood to benefit financially from the construction of the new hospital. A larger hospital would need more supplies and require additional administrative services. Additionally, an entity related to QHR supervised the construction of the new hospital, and QHR served as the purchasing agent during the construction process.

QHR counters that King was trying his best to estimate bad debt expense accurately, and that the errors were largely caused by his efforts to correct a problem with the computer program

---

[6] King's knowledge is imputed to QHR because he was an employee of QHR acting within the scope of his employment.

used at Wayne Memorial for accounting and recordkeeping. When a bill for services was generated at Wayne Memorial, it was sent to the business office for collection. When that occurred, the computer program incorrectly transferred the bill from accounts receivable to bad debt expense. To correct that problem, King ordered Debbie Priester, a WCHA employee, to make manual adjustments to Wayne Memorial's balance sheet. These adjustments, QHR argues, resulted in the underestimation of bad debt expense.

However, even if the manual adjustments are to blame for the systemic underestimation of bad debt expense, it does not necessarily follow that no fraud occurred. While the entire amount transferred by the computer program to bad debt expense may not have been uncollectable, some of it was. Hence, some of it should have remained classified as bad debt expense, or later reclassified as bad debt expense. If King intentionally reduced bad debt expense by more than he should have in order to overstate net accounts receivable, the manual adjustments themselves were fraudulent.[7] Of course, the trier of fact may find that the underestimation was simply an innocent mistake.

---

[7] QHR repeatedly asserts that WCHA is imputed with knowledge of the fraud because Priester, a WCHA employee, physically made the adjustments. That argument is unpersuasive. Priester made the adjustments after King ordered her to. It does not follow that she knew King was using the adjustments to overstate net accounts receivable fraudulently.

AO 72A
(Rev. 8/82)

But because a trier of fact could find for either party, it is a question of fact, and summary judgment is inappropriate.

QHR's damage argument is stronger, and is contained in QHR's Motion for Partial Summary Judgment (Dkt. No. 120). It is, however, ultimately insufficient to entitle QHR to partial summary judgment. QHR is correct that a future default is too speculative to support WCHA's fraud claim. WCHA, however, does not rely on a future default as the basis for damages. Rather, WCHA claims that the $5 million debt itself constitutes legal damages, irrespective of the risk of default. QHR argues that the $5 million in bond debt does not constitute damages because WCHA lists the funds as an asset on its balance sheet and spent the money on another asset, the new hospital, from which WCHA continues to receive benefits. Neither Party cites a single Georgia case or other legal source in support of their positions. Neither is correct.

"To establish a cause of action for fraud, a plaintiff must show that actual damages, not simply nominal damages, flowed from the fraud alleged." *Glynn Cnty. Fed. Emps. Credit Union v. Peagler*, 256 Ga. 342, 344, 348 S.E.2d 628 (1986). From an accounting perspective, the bond financing is a nullity. WCHA converted the $5 million, an asset, into the new hospital, another asset. However, WCHA also incurred $5 million in debt, a liability. The $5 million asset and $5 million liability net

26

to zero.  But from a broader economic standpoint, the situation is less clear.  The $5 million investment could be yielding substantial returns, such that WCHA is in a much better position after the incursion of the debt than before.  In that case, WCHA would not have suffered any damages as a result of the bond financing.  That is QHR's position.  WCHA, however, paints a bleaker picture of its current financial state.  WCHA contends that it is experiencing financial difficulty and has trouble paying some of its bills, in part due to the debt obligations incurred in constructing the new hospital.  Both Parties have evidence to support their claims, though neither appears to be 100% correct.  Whether WCHA suffered damages is therefore a question of fact.  The measure of damages, however, is not the $5 million in bonds, but the financial harm, if any, caused by the incursion of that debt.

Regarding the supplies issue, WCHA alleges that QHR represented to it that QHR was able to save WCHA a substantial amount of money as its purchasing agent, when, in fact, WCHA could have obtained the same supplies cheaper through other purchasing agents.  WCHA relies on the following evidence in support of this claim:  (1) QHR's representation in the 2005 contract renewal proposal that, from 2001 through 2005, it saved WCHA over $1.8 million through the purchasing plan (Dkt. No. 206-16, 5) and (2) an annual review prepared by MedAssets,

WCHA's current purchasing agent, indicating that WCHA saved money by switching from QHR to MedAssets (Dkt. No. 206-17). That evidence does not satisfy the first element - misrepresentation.

All WCHA's evidence establishes is that another purchasing agent could have saved WCHA more money than QHR. But that does not mean that QHR's representation that it saved WCHA money was false. QHR may have procured supplies for WCHA below market value, while MedAssets could have procured them even farther below market value. But if WCHA could only procure the same supplies at market value, then QHR's statement that it saved WCHA money is true. Significantly, WCHA has not even alleged that QHR claimed to be able to purchase supplies for less than *all* other purchasing agents. But that is the only representation that WCHA's evidence would disprove. WCHA has alleged that QHR supplied it with goods above market value. However, WCHA has not produced any evidence indicating what market value was. Without that evidence, the trier of fact could not reasonably conclude that QHR's representation that it saved WCHA money was false.[8] Thus, WCHA cannot recover for the

---

[8] To the extent WCHA is alleging that QHR fraudulently breached the 1991 contract and its extensions by supplying WCHA with goods above market value, the same result holds. WCHA has not adduced any evidence showing that QHR supplied it with goods above market value, or that QHR did not attempt to secure favorable pricing.

AO 72A
(Rev. 8/82)

higher prices it allegedly paid for supplies.[9] QHR's Motion for Summary Judgment is therefore **GRANTED** in part and **DENIED** in part with respect to Count III of WCHA's Counterclaim.

### iii. Counterclaim Count IV

In Count Four of its Counterclaim, WCHA claims that it paid QHR substantial amounts of money in management fees based on QHR's fraudulent misrepresentations. WCHA seeks to recover all of the fees it paid to QHR and punitive damages. A trier of fact could award WCHA at least some of the fees it paid to QHR as damages, and could also award punitive damages. The precise amount of damages is a question for the trier of fact, not the Court ruling on a motion for summary judgment.

QHR first argues that it did not commit fraud by reporting what turned out to be inaccurate financial information to WCHA. For the reasons set forth above, that argument is insufficient to prevent the case from reaching the trier of fact. WCHA has put forth evidence from which a trier of fact could conclude that QHR employees knowingly inflated WCHA's profitability to secure personal financial gain.

Many of the management fees WCHA paid to QHR pursuant to the 1991 contract were paid before the alleged fraud arose, and others may not have resulted from the alleged fraud. However,

---

[9] If WCHA paid QHR fees to act as its purchasing agent, WCHA may be able to recover those fees under its other fraud theories.

not all of them were paid before the fraud arose, and some may have flowed directly from the alleged fraud. For example, WCHA paid King and Morgan performance-based bonuses based on the inaccurate information King was supplying. Those bonuses were allegedly paid in reliance on QHR's alleged fraud, and thus potentially constitute damages. It is, however, the role of the trier of fact to determine which fees, if any, were paid in reliance on QHR's alleged fraud, and which were not. WCHA is not entitled to management fees paid pursuant to the 2006 contract, because its fraud in the inducement claim and defense fail as a matter of law. WCHA may, however, recover bonuses paid to QHR or its employees while the 2006 contract was in force if the bonuses were awarded based on fraudulently misrepresented financial information that was reported to WCHA after the 2006 contract became effective. The entireties clause disclaims reliance on representations made prior to and contemporaneous with the signing of the contract, not representations made thereafter. QHR's Motion for Summary Judgment is therefore **GRANTED** in part and **DENIED** in part with respect to Count IV of WCHA's Counterclaim.

### iv. Counterclaim Count V

WCHA claims in Count Five of its Counterclaim that QHR violated Georgia RICO law, O.C.G.A. § 16-14-1 *et seq.* WCHA

claims that QHR committed at least two acts of federal mail or wire fraud in connection with its alleged on-going scheme to defraud WCHA. QHR argues that it has not engaged in a scheme to defraud WCHA, there is insufficient evidence that QHR intended to defraud WCHA, and WCHA has failed to demonstrate that QHR used the mails or wires in furtherance of a fraudulent scheme.

In addition to the arguments put forth by QHR, King argues that WCHA's RICO claim fails because WCHA has not shown that it relied to its detriment on any representations made by King. King faults WCHA for not responding to its argument that *Pelletier v. Zweifel*, 921 F.2d 1465 (11th Cir. 1991), and Georgia cases relying on *Pelletier*, mandates first-party reliance when a RICO claim is based on mail or wire fraud. The Supreme Court of the United States, however, has clearly held that first-party reliance is not an element of federal mail fraud or a federal civil RICO claim. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 128 S. Ct. 2131, 2139, 2145 (2008). The *Bridge* Court held that a RICO claim would lie if the defendant's scheme were a proximate cause of the plaintiff's damages, even if the plaintiff was not the target of a misrepresentation and did not rely on a misrepresentation. *Id.* at 2145. In so holding, the Supreme Court expressly rejected the Eleventh Circuit's reading of federal RICO. *Id.* at 2137. The Court must decide whether first-party reliance is required

AO 72A
(Rev. 8/82)

for a Georgia RICO claim predicated on federal mail and wire fraud.

The Georgia Court of Appeals has held that first-party reliance is required when a plaintiff brings a Georgia RICO claim predicated on federal mail or wire fraud. *See S. Intermodal Logistics, Inc. v. D.J. Powers Co.*, 251 Ga. App. 865, 872, 555 S.E.2d 478 (2001); *Tom's Amusement Co. v. Total Vending Servs.*, 243 Ga. App. 294, 299, 533 S.E.2d 413 (2000); *Gentry v. Volkswagon of Am.*, 238 Ga. App. 785, 791, 521 S.E.2d 13 (1999). *Southern Intermodal* seems to indicate that the misrepresentation relied on must be made in the mail or wire communication itself, while the general statement of the rule only requires reliance on a misrepresentation made in furtherance of the scheme. *See* 251 Ga. App. at 872. This Court must follow the opinions of the Georgia Court of Appeals in matters of Georgia law "unless there is 'persuasive data' that the Supreme Court of Georgia might render a decision contrary to [the Court of Appeals]." *Doyle v. Volkswagenwerk Aktiengelellschaft*, 81 F.3d 139, 143 (11th Cir. 1996) (quoting *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237, 61 S. Ct. 179 (1940)). If the Court has such persuasive data, it does not have to follow the Georgia Court of Appeals.

"Because the Georgia RICO Act was modeled after the federal statute, [the Supreme Court of Georgia] has found federal authority persuasive in interpreting the Georgia RICO statute."

*Williams Gen. Corp. v. Stone*, 279 Ga. 428, 430-31, 614 S.E.2d 758 (2005). [10] The Georgia Court of Appeals relied on Eleventh Circuit cases in fashioning the above rule. *See Gentry*, 238 Ga. App. at 791 (quoting *Pelletier*, 921 F.2d at 1499-1500, for the proposition that '"when the alleged predicate act is mail or wire fraud, the plaintiff must have been the target of the scheme to defraud and must have relied to his detriment on misrepresentations made in furtherance of that scheme.'"). But the Eleventh Circuit's first-party reliance rule was expressly rejected by the Supreme Court of the United States. *See Bridge*, 128 S. Ct. at 2137, 2145. Because Georgia courts often rely on federal cases when interpreting Georgia RICO and the first-party reliance rule used by the Georgia Court of Appeals came from Eleventh Circuit cases overruled by the Supreme Court, this Court concludes that the Supreme Court of Georgia would not follow the first-party reliance rule. [11] The Court therefore turns to the merits of WCHA's RICO claim.

---

[10] The *Williams General* court relied in part on Supreme Court of the United States cases to reverse the Georgia Court of Appeals. This court predicted that result, and refused to apply the rule utilized by the Georgia Court of Appeals pre-*Williams General*. *See S. Intermodal Logistics, Inc. v. D.J. Powers Co.*, 10 F. Supp.2d 1337, 1346-48 (S.D. Ga. 1998).

[11] Eliminating the first-party reliance requirement will not supply WCHA with an end run around the 2006 contract's entireties clause. The *Bridge* court noted in dicta that a RICO plaintiff would probably not be able to prevail without showing that *someone* relied on the defendant's misrepresentation. *See* 128 S. Ct. 2144. The entireties clause prevents WCHA from claiming that it relied on QHR's misrepresentations when it agreed to the 2006 contract. It is difficult to imagine how WCHA's decision to enter into the 2006 contract flowed directly from a third party's reliance on QHR's misrepresentations.

"To prove a violation of the Georgia RICO statute, [WCHA] must demonstrate two or more predicate acts which are related and have continuity." *Adkins v. Cagle Foods JV, LLC*, 411 F.3d 1320, 1325 (11th Cir. 2005). "Mail or wire fraud occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme." *Pelletier*, 921 F.2d at 1494. "An intent to defraud may be found when the defendant believed that he could deceive the person to whom he made the material misrepresentation out 'of money or property of some value.'" *United States v. Maxwell*, 579 F.3d 1282, 1301 (11th Cir. 2009) (quoting *United States v. Cooper*, 132 F.3d 1400, 1405 (11th Cir. 1998)). The trier of fact "may infer an intent to defraud from the defendant's conduct." *Id.* The second element is satisfied "when [the defendant] acts with knowledge that the use of the mails or wires will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended." *United States v. Ward*, 486 F.3d 1212, 1222 (11th Cir. 2007).

Importantly, mail and wire fraud can be proven by circumstantial evidence of an interstate mailing or wire. *See United States v. Robertson*, 493 F.3d 1322, 1331 (11th Cir. 2007). This can be done by "proof of a routine practice of using the wires [or mails] to accomplish a business end . . . ."

AO 72A
(Rev. 8/82)

*Id.* Also, the mailing or wire does not have to be an essential element of the fraud, so long as it is incidental to an essential part of the scheme or '"a step in the plot.'" *United States v. Waymer*, 55 F.3d 564, 569 (11th Cir. 1995) (quoting *Schmuck v. United States*, 489 U.S. 705, 711, 109 S. Ct. 1443 (1989)). Even "mailing of checks in payment of [a] legal debt" can satisfy the mailing requirement if done "in furtherance of [the overall] fraudulent scheme." *Id.* at 569-70.

WCHA has put forth evidence from which the trier of fact could conclude that QHR intentionally used interstate mails and wires in support of a scheme to defraud WCHA. As discussed above, WCHA has put forth evidence of a multi-year scheme to defraud WCHA of money by inflating WCHA's profitability. There is also evidence from which the trier of fact could infer that this fraud was intentional, such as the testimony of WCHA's current auditor that King and QHR had to have known that the numbers were wrong.

Additionally, WCHA has adduced direct and circumstantial evidence that the mails and wires were used in an essential step of the fraud: transfer of money from WCHA to QHR. QHR is located in Tennessee, while WCHA is located in South Georgia. All communications and payments would need to take place via interstate mails or wires. Albrecht testified that WCHA paid QHR by mailing a check or sending a wire transfer. QHR also

AO 72A
(Rev. 8/82)

communicated internally through email. WCHA has put forth a string of emails sent to and from Albrecht spanning most of 2005. (Dkt. No. 206-13.) In these emails, Albrecht encourages hospitals managed by QHR to pay QHR's management fees via wire transfer, and sends instructions on how to do so. King and Morgan were the recipients of many of these emails, and were located in Georgia. WCHA alleges that QHR fraudulently obtained management fees and bonuses by inflating WCHA's profitability. These emails were in furtherance of the collection of those fees, an essential step in the alleged scheme.

The alleged violations of federal mail and wire fraud are sufficiently related and contiguous to survive summary judgment. The emails span an entire year. The alleged scheme began in 2002, and continued for at least four years. Throughout the duration of the alleged scheme, the motivation was money and the means were misrepresentations as to profitability. The Court therefore **DENIES** QHR's Motion for Summary Judgment as to Count V of WCHA's Counterclaim.

### v. Miscellaneous Damage Claims

WCHA claims three items of damages that do not fall squarely into any of its claims. WCHA seeks to recover Department of Labor Penalties, lost interest on a withdraw from WCHA's Merill Lynch Account, and interest incurred from King's

AO 72A
(Rev. 8/82)

use of a line of credit for business purposes. WCHA is not entitled to recover any of these damages.

WCHA claims that King's mismanagement of employee pension funds led to the Department of Labor sending WCHA a "Notice of Intent to Assess Penalties Letter." (Dkt. No. 144-103.) That letter notified WCHA of its intent to assess a $50,000 penalty. All of the evidence in the record, however, demonstrates that it was the inadequacy of the audits performed by Bryant, Drury, and Griffis that led to the penalty, not King's alleged mismanagement of the funds. (*See* Dkt. Nos 180-84 – 180-88, 144-103.) QHR's Motion is therefore granted with respect to the Department of Labor penalties. Additionally, WCHA is not entitled to recover the money it spent on the Draffin and Tucker audit, which also was made necessary by Kenny Bryant's inadequate audits.

WCHA claims that King and Morgan used $440,000 from a Merrill Lynch investment account and $425,000 from a WCHA line of credit without authorization or knowledge from the WCHA Board of Directors. WCHA admits that King used these funds for hospital purposes. It does not argue that he stole them or misappropriated them for personal use. Nor does WCHA seek the full amount of the withdrawals. Rather, WCHA seeks loss of interest income from the Merrill Lynch account and interest expense from the line of credit.

AO 72A
(Rev. 8/82)

WCHA's claim that the WCHA Board was unaware of the Merrill Lynch withdraw is not supported by the record. Gloria Jean Woodward, a member of the WCHA Board, signed the form authorizing Merrill Lynch to complete the withdrawal. (Dkt. No. 180-74, 4.) WCHA has not offered any evidence to the contrary. QHR is therefore entitled to summary judgment on that claim.

As for the line of credit, WCHA has not shown any damages resulting from the use of it. WCHA did have to pay interest on the withdrawal. But King used the $425,000 to pay into the Georgia Indigent Care Trust Fund program. By paying into the Indigent Care Trust Fund, WCHA was entitled to get money from the Fund. WCHA ended up receiving $1,080,449 from the Fund – $554,749 more than it paid in. Even according to WCHA's calculations, the interest it paid on the line of credit does not come close to that amount. QHR is therefore entitled to summary judgment on WCHA's line of credit claim as well.

### D. The 2006 Contract Damage Limitations Provision

The 2006 contract contains a damage limitations provision that essentially limits WCHA's possible recovery to the fees it paid to QHR for all claims "arising out of, or relating in any way to, this Agreement." (Dkt. No. 180-8 § 7.5.) QHR argues that *all* of WCHA's claims – even those that accrued while the 1991 contract was in effect – are subject to that provision.

AO 72A
(Rev. 8/82)

That argument is without merit. The 2006 contract governs the relationship between WCHA and QHR forward *from the time of its effective date*. That does not include claims that arose while the 1991 contract was in force. Those claims are not subject to the damage limitations provision in the 2006 contract.

Under Georgia law, damage limitations are enforceable, even if they severely or completely restrict the plaintiff's ability to recover. *See Imaging Sys. Int'l, Inc. v. Magnetic Resonance Plus, Inc.* 227 Ga. App. 641, 644, 490 S.E.2d 124 (1997). Because WCHA affirmed the 2006 contract, WCHA is bound by all of the contract's terms, *See Ekeledo*, 281 Ga. at 819, including the damage limitations provision. If WCHA recovers any money for a claim that arises out of or is related to the 2006 contract, its recovery will be limited by the damage limitations provision. Any claims that arise out of or relate to the 1991 contract, however, will not be subject to that provision.

None of the Parties have stated which claims are subject to the damage limitation provision and which are not, aside from QHR's argument – rejected here – that all claims are subject to it. The Court therefore Orders the Parties to submit additional briefing as to which claims are subject to the damage limitations provision and which are not. The Parties are urged not to repeat arguments rejected in this Order.

AO 72A
(Rev. 8/82)

## E.    The 2006 Contract Bench Trial Provision

The 2006 contract contains a forum selection clause, which provides that "all disputes arising out of, or in any way relating to, this Agreement, shall be resolved . . . by a bench trial" in the Brunswick Division of the Southern District of Georgia.  (Dkt. No. 180-8 § 9.1.)  Like the damage limitations provision, the forum selection clause does not apply to claims that arose while the 1991 contract was in force.  Those claims are not related to the 2006 contract.[12]

WCHA argues that the forum selection clause does not apply in light of WCHA's fraud in the inducement claim.  WCHA's argument has no basis in Georgia or Eleventh Circuit law.  Even if WCHA were correct on the law, however, its attempt to avoid the forum selection clause fails because its fraud in the inducement claims and defense fail.

Like the damage limitations provision, none of the Parties have submitted arguments as to which claims are governed by the forum selection clause and which are not:  QHR and the other

---

[12] QHR argues that the forum selection clause applies to all claims because the indemnification provision in the 2006 contract expressly applies to all claims.  That provision states that it applies to "past or future actions or omissions by any Quorum Indemnified Party."  (Dkt. No. 180-8 § 7.1.1.)  That provision thus applies to claims arising while the 1991 and 2006 contracts were in force.  But the forum selection clause and damage limitations provision do not contain similar language.  QHR's argument that the Court should read the "past or future" language into other clauses in the contract lacks any basis in law or reason.  If anything, the different language in the contract provisions shows that QHR and WCHA knew how to draft a provision that applied to past actions, but chose not to when drafting the forum selection clause and damage limitations provision.

AO 72A
(Rev. 8/82)

Defendants argue that all of the claims are subject to the provision, while WCHA argues that the entire provision is unenforceable. Neither of those positions is correct. The Court therefore Orders the Parties to submit additional briefing setting forth which claims (of the surviving claims) should be tried to a jury and which should be tried to the Court. Again, all Parties are urged not to repeat arguments rejected in this Order or misrepresent the Court's holdings. Initial briefs on the damage limitations issue *and* bench trial issue shall be filed ten (10) days from the date this Order issues. Both issues shall be contained in a single brief of no more than twenty (20) pages. Response briefs shall be filed ten (10) days from the day the initial brief is filed, and limited to ten (10) pages.

### F.    **WCHA's Claims Against George King and Charles Morgan**

WCHA's Third Party Complaint against King and Morgan essentially mirrors WCHA's Counterclaim against QHR. King's Motion for Summary Judgment (Dkt. No. 172) largely incorporates QHR's Motion (Dkt. No. 180), and the entirety of WCHA's Brief in Response is an incorporation of its Response to QHR's Motion. The main issue King raises that QHR does not is the reliance issue for WCHA's RICO claim, which the Court addressed above.

AO 72A
(Rev. 8/82)

The Court's holdings regarding the borrowed servant doctrine, election of remedies, WCHA's fraud claims, and WCHA's RICO claim, apply equally to King's Motion. Accordingly, King was not a borrowed servant of WCHA, WCHA has affirmed the 2006 contract and is bound by the entireties clause, and WCHA has elected to proceed solely on its fraud claims. Regarding the fraud claims, King's Motion is **GRANTED** in part and **DENIED** in part with respect to Counts Three, Four, and Five to the same extent as QHR's Motion. King's Motion for Summary Judgment is **GRANTED** as to WCHA's damage claims regarding the Merrill Lynch account, line of credit, and Department of Labor penalties.

The 2006 contract's damage limitations provision and forum selection clause apply equally to WCHA's claims against King as they do to WCHA's claims against QHR. WCHA does not argue to the contrary. King is therefore ordered to brief which of the surviving claims should be tried to the Court, which should be tried to the jury, and which are subject to the damage limitations provision. The above stated time and page restrictions apply to King.

The Court **GRANTS** Morgan's Motion for Summary Judgment (Dkt. No. 177). WCHA has failed to put forth any evidence showing that Morgan was involved in the alleged fraud. WCHA generally alleges that Morgan was King's direct supervisor, and speculates from that fact that Morgan was somehow involved. WCHA only

AO 72A
(Rev. 8/82)

offers two pieces of evidence to support its argument that Morgan was involved in the alleged fraud. The first is a portion of Morgan's deposition, in which WCHA's counsel reads Morgan his job description, and asks if he performed his duties. Morgan responds that he believes that he did. That proves nothing nefarious. Participating with King and QHR in a scheme to overstate fraudulently WCHA's profitability was not in the job description. The only other piece of evidence submitted by WCHA is a document QHR provided to Morgan instructing him on how to respond to media inquiries regarding King's suspension and the financial operations review (Dkt. No. 207-2). Again, that proves nothing fraudulent. Because WCHA has offered no proof whatsoever that Morgan was involved in a scheme to defraud WCHA, or personally committed fraud against it, Morgan's Motion for Summary Judgment is **GRANTED**.

## III. Conclusion

QHR's Motion for Partial Summary Judgment (Dkt. No. 120) is **DENIED**. WCHA's First Motion for Summary Judgment (Dkt. No. 148) is **DENIED**. WCHA's Second Motion for Summary Judgment (Dkt. No. 169) is **DENIED AS MOOT**. QHR's Motion for Summary Judgment (Dkt. No. 180) is **GRANTED IN PART** and **DENIED IN PART**. King's Motion for Summary Judgment (Dkt. No. 172) is **GRANTED IN PART** and

AO 72A
(Rev. 8/82)

**DENIED IN PART.** Morgan's Motion for Summary Judgment (Dkt. No. 177) is **GRANTED.** The Parties have ten (10) days from the date this Order issues to submit the additional briefing called for in this Order. Requests for page extensions will not be entertained.

　　　　**SO ORDERED,** this 12th day of July, 2010.

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　LISA GODBEY WOOD, CHIEF JUDGE
　　　　　　　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT COURT
　　　　　　　　　　　　　　　　　　　　　　　　SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)